**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ELLEN ADAMS and KIMBERLYN
JONES, individually and on behalf of all
similarly situated persons,

       Plaintiffs,

v.

NISSAN NORTH AMERICA, INC.

       Defendant.

Case No. _4:17-cv-2653_

JURY DEMANDED

CLASS ACTION

_____

**PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT**
_____

Plaintiffs Ellen Adams and Kimberlyn Jones, individually and as class representatives on

behalf of all similarly situated persons, bring this action against Defendant Nissan North

America, Inc. ("Nissan" or "Defendant"),  and alleges as follows:

**NATURE OF THE CASE**

1.      Plaintiffs bring this proposed class action on behalf of themselves and other Texas

residents that purchased or own a 2008-2009 Nissan Altima vehicles ("the Class Vehicles").

Nissan sold the vehicles without first telling consumers  that Nissan had opted to install

dashboards in the vehicles that ***do not*** withstand exposure to sunlight and  that melt, emit a

noxious chemical smell, and take on a reflective quality.  When the dashboards become

reflective, drivers trying to see through the windshield have to struggle to see past the image of the

dashboard in the windshield.  When the sun or another bright light catches the dashboard at the

right  angle, the glare off of a melted dashboard can significantly obstruct the driver's view, thus

endangering  the motoring public. As such, Plaintiffs' vehicles and the Class Vehicles are unfit

for transportation because they pose a significant safety hazard to Plaintiffs, the other members of

the proposed class, and the general public. When Nissan became aware of the defect, it concealed

the defect from the public, including Plaintiffs and the proposed Class.

2.    On January 6, 2017, the United States District Court for the Southern District of

Florida entered *Final Order and Judgment* in Cause No. 0:14-cv-62567, *Sanborn, et al. v. Nissan*

*North America, Inc.* ("*Sanborn*") certifying the following class:

> All consumers who are residents of, and purchased or leased a new
> or used 2008 or 2009 Nissan Altima in, the State of Florida on or
> before April 1, 2017. The Settlement Class excludes any people or
> businesses that did not purchase or lease the Class Vehicles as
> consumers, thereby excluding any automobile dealers of any kind
> or others who did not lease or purchase the Class Vehicles for
> ordinary consumer use.[1]

3.    In *Sanborn*, the plaintiff filed an almost identical class action case against Nissan

North America, Inc. on behalf of a class of Florida residents. After preliminary approval of the

class action settlement in *Sanborn*, the district court authorized that Class Notice be issued.[2]

4.    According the parties' Joint Motion for Final Approval of Class Settlement and

Supporting Memorandum in *Sanborn*:

> Plaintiffs propounded 28 document requests to assess what Nissan
> knew about the Altima's dashboard material and when it knew it,
> and subpoenaed four of Nissan's suppliers. After Plaintiffs and
> their expert consultants had evaluated the document productions,
> Plaintiffs then deposed Nissan's corporate representative and five
> other Nissan employees who were involved with the Altima's
> dashboards. During this time, each plaintiff also responded to 11
> interrogatories and 7 documents requests from Nissan, and each sat
> for deposition. Plaintiffs' fact discovery did not turn up evidence

---

[1] See *Final Order and Judgment* in Case No. 0:14-CV-62567, attached as Exhibit A.
[2] See *Class Notice* in *Sanborn*, attached as Exhibit B.

that Nissan knew about the dashboard defect when it first distributed the 2008 and 2009 Nissan Altima. But in Plaintiffs' view, the evidence could be interpreted to show Nissan should have known that the dashboard material was not properly formulated or tested, and that Nissan concealed the defect from the public when it did discover the defect. (*See* Plfs. Opp. to MSJ [DE 153] at 2-7.) Nissan vigorously contests Plaintiffs' view of the evidence.

Expert discovery proceeded until March 2016, and involved four experts retained by Plaintiffs and three by Nissan. Plaintiffs retained an expert in automotive plastics, Dr. Anand Kasbekar, who opined that the Altima dashboard material was poorly formulated and that Nissan would have known about the defect if it had properly tested the material prior to release. (*Id.* at 4-5.) They retained an expert in the automotive industry, Richard Diklich, who inspected Deteriorated dashboards and testified that the resulting degradation was extraordinary and created glare that, under certain situations, could serve to obstruct a driver's vision. (*See* 01/29/16 A. Zeman Decl. [DE 80], Ex. 22 at 4-5.) Plaintiffs also retained a survey expert, Dr. Melissa Pittaoulis, who conducted a conjoint study to assess how consumers' willingness to pay for a Nissan Altima would have been affected if they had been told that the vehicles' dashboards were defective. (*Id.*, Ex. 39.) And they retained a damages expert, Frank Bernatowicz, who used the conjoint results and other methods to estimate the damages to class members and the amount of Nissan's unjust enrichment at over $1000 per class vehicle. (*Id.*, Ex. 32 at 19-20.)[3]

5.    Under the *Sanborn* class settlement, any class member whose dashboard has undergone "deterioration" may obtain a replacement dashboard from Nissan at a net cost of $250, which normally would cost between $1,500 to $2,000 depending on certain factors.[4] *Sanborn* class members only had to present their vehicle at a Nissan dealership before April 29, 2017 to have their dashboard replaced. For those class members that had already paid to repair

---

[3] Joint Motion for Final Approval of Class Settlement and Supporting Memorandum, EFC. 194; Cause No. 0:14-cv-62567, *Sanborn, et al. v. Nissan North America, Inc.*
[4] *Id.*, at p. 5.

their dashboards, Nissan agreed to reimburse them for all but $250 of a class member's prior repair expenses. [5]

6.      On behalf of themselves and the proposed Texas class, Plaintiffs seek to compel Nissan to warn drivers about the known  defect and to bear the expense of replacing dashboards that should never have been placed in the stream  of commerce in the first place.

## PARTIES

1.      Plaintiff Ellen Adams is a citizen and resident of Houston, Texas, located in the Southern District of Texas.

2.      Plaintiff Kimberlyn Jones is a citizen and resident of Houston, Texas, located in the Southern District of Texas.

3 .      Defendant Nissan North America, Inc. has its headquarters and principal place of business in Franklin, Tennessee.  Nissan North America, Inc. is the U.S. subsidiary of Nissan Motor  Company, Ltd., which is a company that has its headquarters in Japan.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

5.      This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Nissan because Nissan conducts substantial business in this District, and some of Nissan's actions giving rise to the complaint took place in this District.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

---

[5] Id.

part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

7.      Nissan North American, Inc. manufactures, markets, distributes, and warrants automobiles in the United States, including Nissan Altima cars. This lawsuit concerns model years 2008-2009 Nissan Altima vehicles (the "Class Vehicles").

### The Altima Defect

8.      The Class Vehicles have  defective dashboards that melt, crack, and become sticky when exposed to sunlight and the Texas climate.

9.      The part number category for the defective dashboards is 68200 and the dashboards were supplied by Calsonic Kansei North America, Inc. ("CKNA").

10.     Since the early 1900s, automotive dashboards or instrument panels (IPs) have been the focal point of vehicle interiors. Located at the base of the windshield directly in front of the driver and passenger, the instrument panel houses the vehicle's controls, gauges, glove box, heating and cooling vents, and airbags. Over the past century vehicle dashboards have evolved and modern vehicles are equipped with padded dashboards that are typically constructed using polyurethane foam padding that is covered by an outer textured polyurethane or polyvinylchloride skin.

11.     In connection with *Sanborn*, an evaluation of dashboard failures that in 2008-2009 model year Nissan Altima vehicles. The dashboards or instrument panels in these proposed Class Vehicles are fabricated using an outer thermoplastic polyurethane skin, which is referred to as TPU skin.

12.     Although TPU is not uncommon in automotive instrument panels, the material comes in various different grades of resins which incorporate different proprietary additives and

stabilizers.

13.     The level and nature of these additives directly affect the properties and quality of the TPU, including the long term stability of the material. The dashboards in the subject vehicles have been reported to crack, "melt", become sticky or tacky, and develop a glossy reflective surface. As a result of this defect, the top surface of the dashboard which often becomes highly reflective can significantly interfere with the driver's ability to see clearly through the windshield.

14.     The level of interference can obscure portions of the driver's forward field of view and therefore is a significant safety concern to the vehicle occupants as well as others who may be in the path of the vehicle.

15.     The cost to replace the dashboard in these vehicles averages about $1,500 and can approach $2,000. To date Nissan has not provided Texas owners of Class Vehicles with a reasonable remedy to repair or replace the failing dashboards.[6]

16.     In connection with the *Sanborn* case, analytical laboratory testing of the two Nissan Altima (MY2007 and MY 2009) dashboard samples was performed by Materials Engineering Technical and Support Services ("METSS").

17.     The testing consisted of spectroscopic, chromatographic, and oxidative analyses of the dashboard samples in order to further evaluate the cause of the glossy and tacky surface.

18.     Fourier Transform Infrared spectroscopy confirms that the samples are polyurethane based and support that the TPU skin of the top dashboard surface is more severely damaged from hydrolysis than the sample removed from the side of the same dashboard.

19.     This conclusion was confirmed by exposing the TPU skin from the side of the

---

[6] *See Investigation and Failure Analysis of 2007-2012 Nissan Altima Dashboards*, by Ana and David Kasbekar, Ph.D., a redacted version of which is attached as Exhibit C.

dashboard to hot water vapor in order to hydrolyze a portion of Sample A.

20.    FTIR data from this sample were compared with data from the tacky/glossy sample removed from the top of the same dashboard. This comparison revealed that the observed differences between the FTIR spectra from Sample A and Sample B are consistent with hydrolysis of the TPU. FTIR analyses of the foam sections of Sample A and Sample B did not show indications of structural changes, but only variations in the intensity of the spectra consistent with degradation of the urethane.

21.    Thermogravimetric analysis (TGA) which measures changes in physical and chemical properties as a function of temperature was utilized to further analyze and compare the condition of the TPU skin from Sample A and Sample B. This analysis reveals that the temperature at which the material began to oxidize and decompose in Sample B is approximately 40 oC lower than that of Sample A. The suppressed temperature result is consistent with molecular degradation and severe hydrolysis of Sample B, which was removed from the top surface of the dashboard. Gas chromatography mass spectrometry (GCMS) was used in an attempt to identify the extracted components from Sample A and Sample B. Although small fractions of molecules with very low molecular weight were extracted, the amount of these compounds was insufficient to identify the substance. Furthermore, the very low quantity of these components makes it very unlikely that they are the cause of the glossy and tacky condition of the TPU. While larger samples and additional work may be beneficial with regard to identifying the lower molecular weight substances, it is not warranted at this time given overwhelming evidence that hydrolysis of the TPU skin is the primary failure mechanism of the subject dashboards and the resulting tacky surface.

22.    Review and analysis of the documents provided by Nissan to plaintiffs in *Sanborn*

supports the hydrolytic degradation of the TPU skin in the subject vehicles' dashboards.

23.    At the time of manufacture of the Class Vehicles it was known that urethanes including TPUs were subject to hydrolysis and especially in warm humid environments. The effects of hydrolysis on the degradation of urethane were well understood at the time that the subject dashboards would have been designed and for this reason the defendants should have tested the TPU for hydrolysis and either modified the subject material appropriately or investigated alternative materials that would have withstood the foreseeable operating conditions for the vehicle. Basic research regarding urethanes would have revealed that these materials are susceptible to extensive hydrolysis at elevated temperatures and humidity unless properly stabilized.

24.    The use of hydrolysis stabilizers in polyurethane materials dates back to 1965 and perhaps earlier [US Patent Number 4,845,161 which references British Patent No. 993,600]. In 1972 Schollenberger and Stewart published a paper entitled Thermoplastic Polyurethane Hydrolysis Stability. This publication specifically addressed the use of carbodiimide as an effective stabilizer against hydrolysis in TPUs over 3 decades prior to the use of this material in the subject Nissan dashboards. Hydrolysis of polyurethane is also discussed in more general publications along with the potential for loss of mechanical properties of thermoplastics exposed to moisture at elevated temperature [Characterization and Failure Analysis of Plastics, 2003; Principles of Polymer Systems, 1982; Polymer Degradation, 1981; Thermal Stabilities of Different Polyurethanes After Hydrolytic Treatment, 1998; Polyurethane Elastomers Having Improved Hydrolysis Resistance- Patent WO2000050485A1/ US 6486224 B2 2002]. These issues were documented in literature that was available to engineers and scientists long before Nissan decided to incorporate TPUs into the subject dashboards.

25.     As early as 1951 Charles Conrad invented the environmental chamber [History of Thermotron http://thermotron.com/about-us/history]. The technology required to test materials at elevated humidity and temperature, such as thermo-hygrostatic chambers or environmental temperature/humidity chambers, was readily available decades before the design and start of production of the subject vehicles. The equipment and methodology utilized by Nissan in 2012 was available and practical for use at the time of the design and start of production of the subject vehicles. These chambers had a temperature range of up to 177°C and a humidity range up to 98% RH, and were fully cable of the high temperature and high moisture level of [Archival Web -Who is Thermotron, December 6, 1998; Thermotron SM-Series Temp/Hum Chambers February 22, 1999].

26.     The importance of dashboard reflectance with regard to driver performance and safety has been studied and was known to be a critical design element years before the start of production of the subject vehicles  [Daytime Veiling Glare and Driving Performance - UMTRI-96-13, Daytime Veiling Luminance from Windshields - UMTRI-2003-36, Instrument Panel Coatings to Reduce Veiling Glare and for Decorative Effects - SAE 940646, Evidence-Based Perspective on the Effect of Automobile-Related Modifications on the Driving Ability, Performance, and Safety of Older Adults – The American Journal of Occupational Therapy]. Veiling glare onto windshields from reflective dashboard materials adversely affects driver vision and compromises the ability of the driver to detect objects in front of their vehicle. This phenomenon is particularly dangerous for older individuals and in situations where safety depends on detecting low contrast objects, such as a dark object against a dark background. Veiling luminance from reflected light is more problematic on sunny days and therefore would be an even greater concern in regions such as Florida. Videos and photographs of Louis

Lucrezia's 2008 Nissan Altima provided by Richard Diklich clearly illustrate the significance and danger of a defective dashboard that has increased reflectance due to degradation of the TPU surface.

27.     At the time of manufacture of the Class Vehicles it was known or should have been known by Nissan that the vehicles would be operated in warm humid environments including areas within the state of Texas.

28.     The cause of the failure of the Class Vehicles' dashboards to perform as intended is the use of an improperly formulated TPU that is prone to rapid and severe hydrolysis especially in warm humid climates.

29.     At the time of manufacture of the Class Vehicles, it was known that urethanes including TPUs were subject to hydrolysis and especially in warm humid environments.

30.     The effects of hydrolysis on the degradation of urethanes were well understood at the time that the subject dashboards were produced.

31.     At the time of manufacture of the Class Vehicles it was technologically feasible and not uncommon to test components at elevated temperature and humidity levels that would have exposed the defect in the subject dashboards.

32.     The need for and use of hydrolysis stabilizers such as carbodiimides in thermoplastic polyurethanes was identified several decades prior to a) the production of the Class Vehicles and b) the decision to use a TPU that did not contain an appropriate stabilizer to resist hydrolysis.

33.     Hydrolysis of the TPU was foreseeable, and the resulting extensive degradation and severe loss of tensile properties is a failure of the dashboard regardless of whether or not there is visible cracking of the dashboard.

34.     Transformation of the dashboard from a textured surface with minimal reflectivity to a smooth glossy surface with high reflectivity causes the image of the dashboard to specularly reflect onto the windshield under certain lighting conditions. This reflection of the dashboard compromises the driver's ability to see out of the windshield and therefore makes the vehicle unreasonably dangerous to operate.

35.     Nissan should have been aware of the potential for degradation of the thermoplastic urethane (TPU) at elevated temperature and humidity prior to incorporating this polymer into the subject dashboards.

36.     Nissan should have tested the TPU material at elevated temperature and humidity and should have made certain that hydrolysis stabilizers were present in this material.

37.     Nissan has judicially admitted that "[u]nder certain conditions, when exposed to some combination of high temperature and high humidity, the material provided by Sanyo to CKNA and installed in Nissan Altimas can undergo hydrolysis, which degrades the material and which could manifest in cracking and/or softness of the dashboard skin." [7]

38.     Nissan has further judicially admitted that "[o]ver time, this issue can manifest in a dashboard as "soft, gooey, [or] shiny."

39.     When the dashboards in the Class Vehicles melt, they produce a noxious chemical smell and ooze a chemical compound that is sticky to the touch. The dashboards also melt, deform, crack, and tear, as depicted herein. The degradation causes the dashboards in Class Vehicles to become reflective, resulting in unpredictable glare being cast onto the windshield and into the drivers' eyes. This makes it difficult and sometimes impossible to see and safely operate

---

[7] See Nissan's Statement of Material Facts, partially redacted, (ECF. 128) in Case No. 0:14-CV-62567, attached as Exhibit D.

the vehicle, putting drivers, passengers, and others on the  road at risk.  Even when a driver's vision is obstructed for just a moment, the driver cannot see and  respond to hazards, such as children running in front of the vehicle or pedestrians trying to cross the  road, which makes the Class Vehicles unfit for ordinary transportation.

40.    In addition, the Class Vehicles are equipped with a passenger side airbag that deploys  through precisely designed perforations in the dashboard.  The parts affecting airbag release are designed  with great attention to detail, with the recognition that in an accident it is essential that they deploy as designed. Thus, the spacing and size of the perforations designed to facilitate the properly timed and located airbag release are subject to precise specifications. As the dashboards in Class Vehicles degrade, however, they commonly become visibly misshapen, raising the likelihood that in the  event of a collision, the airbag will not release as designed.

41.    Owners of 2008-2009 Altimas have posted pictures on Nissan's Facebook page notifying Nissan of the severity of the glare from their melting dashboards.







As seen in this picture posted on Nissan's Facebook page, the user showed Nissan how much the view was obstructed by the  glare from the melting dashboard.  The first picture above shows how the glare makes it very difficult to see a  pedestrian just a few feet from the vehicle.

42.     Another user posted a picture on Nissan's Facebook wall showing the glare on  the windshield from the  melted Nissan Altima dashboard:



43.     Because this was posted on Nissan's Facebook page, which the company undoubtedly routinely monitors,  Nissan has had the opportunity to get a firsthand look at how the defect affects drivers and their safety.  As the  photograph above shows, the shiny surface of the melting dashboard creates a reflection on the  windshield that makes it very hard to see when driving.

44.     As a result of the defect, there have been at least two reported accidents, while many other drivers have told Nissan and the National Highway Traffic Safety Administration ("NHTSA") that they feel unsafe driving their vehicles. Because the replacement of the dashboard can cost several thousand dollars, however, and because Nissan refuses to cover the full cost of repairs, many drivers are not in a position to replace the dashboard. Moreover, Nissan has recognized the defect but only chosen to repair it for drivers who reside in Florida and concealed the defect from owners of Class Vehicles in other states.

## NISSAN'S KNOWLEDGE OF THE DEFECT AND THE DANGERS POSED

45.     Nissan knew or should have known when it sold the Class Vehicles that the dashboards would not hold up to exposure to sunlight and that the result would be an unsafe condition for drivers.

46.     Nissan has known for decades that dashboard reflections can impair drivers' vision and can make it harder to see pedestrians and objects on the road. For instance, a paper published in 1996 by researchers for the University of Michigan Transportation Research Institute found that when a dashboard casts a reflection in the windshield it can impair the drivers' vision. *See* Schumann, Josef, Daytime Veiling and Driver Visual Performance: Influence of Windshield Rake Angle and Dashboard Reflectance, *The University of Michigan Transportation Research Institute* (1996).

47.     Likewise, product defects that obstruct the vision of drivers pose a severe safety hazard, and there have been many recalls related to obstructions of the driver's vision. For instance, there were several recalls in 1998 for defective windshield wipers in Nissan 200sx cars because when windshield wipers cannot clean the glass of the windshield, a driver's vision can be

obstructed.[8]  Other automotive  manufacturers, such as Ford, have had recalls because of bubbles that form on the windshield in higher  temperatures, which could obstruct drivers' vision.[9] Similarly to these prior recalls, the Class Vehicles'  melting dashboards pose a severe safety hazard to drivers because they can obstruct a driver's vision.

48.    As early as 2006, Nissan became aware that drivers were complaining that the dashboards in Nissan's Infinity FX35 and FX45 vehicles were melting and degrading. Nissan was ultimately persuaded to extend the warranty for those vehicles, covering dashboard degradation for up to eight years in the 2003-2008 FX35 and FX45 vehicles.[10]

49.    Despite Nissan's knowledge in at least 2006, Nissan continued to install dashboards in its vehicles that melt when exposed to  sunlight. Furthermore, Nissan never extended its warranty to drivers of vehicles with melting  dashboards in Nissan 2008-2009 Nissan Altimas.

50.    Given the composition of the dashboards in the Class Vehicles and the known and identical problem in the Infinity FX35 and FX45 vehicles, Nissan knew or should have  known that the dashboards in the Class Vehicles would melt and crack with high exposure to sunlight. Nissan nonetheless decided  to sell Class Vehicles without altering the dashboards, putting Nissan drivers, passengers, and others on  the road at risk.  Nissan did not tell customers or dealers that

---

[8] http://www.automd.com/recall/nissan_m/200sx_mm/

[9] http://www.ncconsumer.org/news-articles/ford-recalls-e-series-vehicles-with-windshield-defect.html

[10] Many owners of 2003-2008 FX35 and FX45 Infiniti vehicles, however, were still denied a repair of their dashboards because their vehicles were out of the 8-year extended warranty when their dashboards started to melt and deteriorate. Nissan also did not  compensate the Florida owners of 2003-2008 FX35 and FX45 Infiniti vehicles for the loss in resale value  to their vehicles from the known problem with Infiniti's melting dashboards. Nissan also never disclosed  to drivers that their melting dashboards were a safety hazard and maintained that the issue was merely  cosmetic.

the dashboards would melt and crack with  exposure to sunlight.  Nissan thus had exclusive and

superior knowledge of the dashboard defect and  actively concealed the defect and corresponding

danger from consumers who had no way to reasonably  discover the problem before buying and

driving their vehicles.

51.    Had consumers been aware of the dashboard defect in their vehicles, they would

not have  purchased their vehicles or would have paid far less money for them.  As Nissan knows,

a reasonable  person would consider the dashboard defect important and would not purchase a

vehicle with a  potentially defective dashboard or would pay substantially less for the vehicle.

### Nissan's Refusal to Repair the Defective Dashboards

52.    Nissan has concealed the defect and refused to notify its other customers, including

Plaintiffs and the other class mambers, of the dashboard  safety defect or to cover the full costs of

repairs for the Class Vehicles.  The total for parts and labor to  replace a dashboard is around

$2,000, depending on where the part is replaced.

53.    Nissan's refusal to pay for the complete cost of dashboard repairs has caused great

hardship to Nissan owners.  Many drivers cannot afford to spend up to $2,000 to replace their

dashboards and are forced to continue to drive unsafe cars, risking getting into a crash or hitting a

pedestrian.  Nissan  owners also have difficulty selling their vehicles because of their melted

dashboards.  Nissan owners  who are able to sell their cars with melted dashboards are forced to

sell their vehicles at a discount  due to the dashboard defect.

## PLAINTIFFS' EXPERIENCE

54. Plaintiff Ellen Adams's 2008 Nissan Altima was purchased new from Champion Nissan (n/k/a AutoNation Nissan Katy) in 2008.

55. Ms. Adams purchased a Nissan because she believed Nissan vehicles to be vehicles of high quality and superior safety.

56. About one and a half years ago, Ms. Adams noticed that her dashboard was sticky to the touch and it was producing a glare on her windshield that interfered with her ability to drive safely.

57. The condition of Ms. Adams's dashboard progressively worsened and the melting of the dashboard caused a blinding reflective glare, making it difficult to see out of the windshield and obstructing Ms. Adams's view while driving the vehicle.

58. Because of the dashboard defect, Ms. Adams's vehicle is unfit for ordinary transportation because it poses a serious safety to risk to her and other members of the motoring public.

59. Because of the dashboard defect, Ms. Adams is leary to driver her vehicle and would like to have the dashboard replaced. As such, Ms. Adams's vehicle is not fit for its ordinary purpose of safe transportation.

60. The photograph below depicts Ms. Adams's dashboard in its current condition:



61. Plaintiff Kimberlyn Jones's 2009 Nissan Altima was purchased new from Conroe Nissan in Conroe, Texas. Ms. Jones purchased a Nissan because members of her family had always been loyal Nissan buyers, believing them to be vehicles of high quality and superior safety.

62. Ms. Jones's dashboard has deteriorated to the point where you cannot place anything on it or else it will stick to it.

63. Because of the dashboard defect, Ms. Jones's vehicle is unfit for ordinary transportation because it poses a serious safety to risk to her and other members of the motoring public.

64. Because of the dashboard defect, Ms. Jones is leary to driver her vehicle and would like to have the dashboard replaced. As such, Ms. Jones's vehicle is not fit for its ordinary purpose of safe transportation.

65. The photographs below depict Ms. Jones's dashboard in its current condition:







66.     Nissan settled claims from Florida Nissan Altima owners but continues to deny and conceal the defect to consumers outside of Florida, despite a duty to do so. Consumers in Texas and other states are left without recourse as Nissan concealed the defect until the express warranties had expired.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs propose to represent: *All persons residing in Texas who own model year 2008-2009 Nissan Altima with a deteriorating dashboard.*[11]

68.     Excluded from the proposed class is Nissan; any affiliate, parent, or subsidiary of Nissan;  any entity in which Nissan has a controlling interest; any officer, director, or employee of Nissan; any  successor or assign of Nissan; anyone employed by counsel for Plaintiffs in this action; any judge to  whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to  either of them, as well as the spouses of such persons; and anyone who purchased a Class Vehicle for the  purpose of resale.

69.     This action has been brought and may properly be maintained on behalf of the class  proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

70.     <u>Numerosity</u>. Nissan sold hundreds of thousands of Class Vehicles, including thousands in Texas.  Members of the proposed class likely number in the tens of  thousands and are thus too numerous to practically join in a single action.  Class members may be  notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary   or appropriate by the Court).

71.     <u>Existence and predominance of common questions</u>.  Common questions of law and fact  exist as to all members of the proposed class and predominate over questions affecting only

---

[11] Nissan defines "deteriorating" to include cracking, deforming, melting, bloating, out-of-the-ordinary softening, and stickiness. *See* ECF. 194 in *Sanborn*.

individual class members. These common questions include whether:

a.  Class Vehicles were factory equipped with defective dashboards;

b.  Nissan knew about the dashboard defect and, if so, when Nissan discovered the defect;

c.  The existence of the dashboard defect would be important to a reasonable person, for example, because they pose an unreasonable safety risk;

d.  Nissan disclosed the dashboard defect to potential customers or owners that had already acquired a 2008-2009 Altima;

e.  Nissan concealed the defect to existing owners until the express warranties on the 2008-2009 Altimas had expired.

f.  Nissan dealerships have failed to provide dashboard repairs at no cost for Class Vehicles;

g.  Whether Plaintiffs and the members of the class are entitled to equitable and/or injunctive relief.

72.  <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the proposed class. Plaintiffs and the class members they propose to represent purchased a Class Vehicle that contains the same defective dashboard, giving rise to substantially the same claim.

73.  <u>Adequacy</u>.  Plaintiffs are adequate representatives of the proposed class because their interests do not conflict with the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of members of the class will be fairly and adequately protected by Plaintiffs and their counsel.

74.    <u>Superiority</u>.  The class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each class member, while meaningful on an  individual basis, is not of such magnitude as to make the prosecution of individual actions against  Nissan economically feasible.  Even if class members themselves could afford such individualized  litigation, the court system could not.  In addition to the burden and expense of managing many actions  arising from the Nissan defect, individualized litigation presents a potential for inconsistent or  contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the  court system presented by the legal and factual issues of the case.  By contrast, the class action device  presents far fewer management difficulties and provides the benefits of single adjudication, economy of  scale, and comprehensive supervision by a single court.

75.    In the alternative, the proposed class may be certified because:

a.    the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to  individual class members which would establish incompatible standards of  conduct for Nissan;

b.    the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications,  or substantially impair or impede their ability to protect their interests; and

c.    Nissan has acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final and injunctive relief with respect to the  members of the proposed class as a whole.

76.    Through this action, Plaintiffs, individually and on behalf of the other Class

members, seek injunctive relief in the form of a repair to fully remedy the defects in the Class Vehicles such that they have their economic value restored and can be operated safely or damages to compensate them for diminished value of their Altimas as a result of the defects and Nissan's wrongful conduct.

## TOLLING OF THE STATUTES OF LIMITATION

77.     All applicable statutes of limitation have been tolled by Nissan's knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs and Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Nissan concealed information within its knowledge from consumers, nor would a reasonable and diligent investigation, after Plaintiffs first noticed the problem, have disclosed that Nissan had information in its possession about the existence and dangerousness of the defect and opted to conceal that information until it resolved the *Sanborn* class action.

240.    Nissan was, and remains, under a continuing duty to disclose to NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Class Vehicles; that this defect is based on defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Class Vehicles.

241.    Because of the active concealment by Nissan, any and all limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

## FIRST CAUSE OF ACTION

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(TEX. BUS. & COM. Code § 2.314)

**78.**     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

79.     Nissan was a merchant with respect to the Class Vehicles under TEX. BUS. & COM. Code § 2.104.

80.     Under TEX. BUS. & COM. Code § 2.314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transaction in which and the proposed Class purchased their Class Vehicles from Nissan.

81.     Nissan impliedly warranted that the Class Vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

82.     The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the defective dashboards are inherently defective in that there are defects in the materials used that cause the dashboard to melt and cast a reflective glow on the windshield which has been known to result in at least two known crashes.

83.     As a direct and proximate result of Nissan's breach of the implied warranty of merchantability, Plaintiffs and the proposed Class have been damaged in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### MONEY HAD AND RECEIVED / UNJUST ENRICHMENT

84.    Plaintiffs, on behalf of themselves and the proposed class, hereby re-allege the paragraphs above.

85.    Plaintiffs plead this cause of action in the alternative to his other causes of action.

86.    Plaintiffs bring this claim individually and on behalf of the proposed Class.

87.    Plaintiffs and Class members have conferred non-gratuitous benefits on Defendant by  purchasing and leasing Class Vehicles, reasonably expecting to receive a vehicle that was free of  defects.

88.    Defendant has knowledge of and has accepted and retained the benefits conferred.

89.    The Class Vehicles purchased and used by Plaintiffs and Class members contained defective dashboards, and Plaintiffs and Class members would not have paid money for their vehicles,  or would have paid substantially less for their vehicles had they been aware that their vehicles had  defective dashboards. Under the circumstances, it would be inequitable for Defendant to retain the  benefit conferred without compensating Plaintiffs and Class members.

90.    Plaintiffs request that this Court enter judgment in his favor for disgorgement and restitution of the benefits conferred on Defendant, including wrongful profits and revenues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.    For an order certifying the proposed class and appointing Plaintiffs and their counsel to  represent the class;

b.    For an order awarding Plaintiffs and the members of the class actual damages;

c.    For an order awarding Plaintiffs and the members of the class restitution,

disgorgement or other equitable relief as the Court deems proper;

      d.    For an order requiring Nissan to adequately disclose and repair the dashboard defect;

      e.    For an order awarding Plaintiffs and the members of the class pre-judgment and post- judgment interest;

      f.    For an order awarding Plaintiffs and the members of the class reasonable attorney fees and costs of suit, including expert witness fees; and

      g.    For an order awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: September 1, 2017          Respectfully submitted,

                        **STECKLER GRESHAM COCHRAN PLLC**

                        */s/ Dean Gresham*
                        R. Dean Gresham
                        Texas Bar No. 24027215
                        Bruce W. Steckler
                        Texas Bar No. 00785039
                        L. Kirstine Rogers
                        Texas Bar No. 24033009
                        12720 Hillcrest Rd., Ste. 1045
                        Dallas, TX 75230
                        Tel: 972.387.4040
                        Fax: 972.387.4041
                        dean@stecklerlaw.com
                        bruce@stecklerlaw.com
                        krogers@stecklerlaw.com

                        ***Attorneys for Plaintiffs and the Putative Class***